In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1196

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN ADAME,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 192 — **Harry D. Leinenweber**, *Judge.*

ARGUED APRIL 5, 2016 — DECIDED JUNE 28, 2016

Before WOOD, *Chief Judge,* and BAUER and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted defendant-appellant, Juan Adame, of one count of arson affecting interstate commerce in violation of 18 U.S.C. § 844(i). Adame appeals on two grounds: that there was insufficient evidence to uphold his conviction and that the government introduced inadmissible evidence against him during trial. We find against both arguments and affirm Adame's conviction.

## I. BACKGROUND

### A. The Fire

Around 4:30 a.m. on January 14, 2012, the Chicago Fire Department responded to a fire reported at a two-story building located at 4246 West 63rd Street. The building's first floor was vacant commercial space and the second floor was split into two apartments. One apartment was leased by Blanca Ortiz, and the other by Jimmy Maca. When the Fire Department personnel arrived, they saw smoke coming from the second floor of the building. The crew entered and discovered a fire in Ortiz's apartment. No one was present in the apartment. The crew extinguished the fire and searched the other apartment, where they found Maca dead from smoke inhalation.

On March 21, 2012, the Chicago Police Department, working jointly with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), arrested Adame, Ortiz's ex-boyfriend. A grand jury indicted Adame on August 15, 2012, for one count of maliciously causing damage by fire to a building used in interstate commerce in violation of 18 U.S.C. § 844(i). The case proceeded to a jury trial, which began on October 7, 2013, and concluded on October 11, 2013.

### B. Evidence Presented at Trial

At trial, Ortiz testified that she and Adame began dating in August 2011, but broke up on January 13, 2012, following a fight. Ortiz described how, during their relationship, Adame frequently stayed at her apartment and kept his clothes and belongings there, even though she had never given him

permission to do so. He also broke into her apartment on two occasions, and had driven her Ford Mustang without her permission. In addition, he had taken several video recordings on his cell phone of Ortiz without her knowledge. She stated that he was "very controlling" of her, which was a source of several fights during their relationship.

Ortiz testified that on the evening of January 13, 2012, she and Adame were at her home in Indiana, which she owned in addition to the Chicago apartment. At around 8:30 p.m., she and Adame got into a heated verbal fight that culminated in Ortiz leaving the house and Adame pulling the door handle off the car as she drove away. After she left, Adame took several bags full of clothes and other possessions from Ortiz's Indiana house and placed them in garbage bags. He then took Ortiz's 2007 Ford Mustang and left with the garbage bags. He exchanged text messages with Ortiz throughout the evening. Ortiz accused Adame of stealing her possessions and informed him that she did not want "anything at all to do with you."

Maria Navarette testified that she had previously dated Adame, and the two had remained friends. She said that on the evening of January 13, 2012, after Adame had left Ortiz's Indiana residence, he called and texted Navarette to ask her to go dancing, to which she agreed. He arrived at her house in Chicago driving Ortiz's Mustang. Navarette noticed the backseat of the Mustang contained several full garbage bags. Adame told Navarette that they should drive a different car because something was wrong with the Mustang. Navarette called a friend and asked to borrow her car. The friend agreed, so Adame and Navarette drove to Navarette's friend's house

and borrowed the car. Adame grabbed his backpack from the Mustang and brought it with him.

Navarette testified that once they got into her friend's car, Adame told her to stop for gas. Navarette thought the car had enough gas, but Adame insisted they stop for gas anyway. She drove to a gas station and Adame told Navarette to go inside and pay for $10 worth of gas. She did so, while Adame got out of the car and went to the gas pump. She stated that after she paid the cashier, she went back to the car and saw numbers going up on the machine, but did not see the gas nozzle inserted into the car's gas tank. Once the pump reached $10, Adame returned the nozzle and washed the car's windshield with his bare hands (despite the fact that it was winter), and dried his hands with the gas station towel. He then got in the car and put on his gloves.

Navarette testified that when they left the gas station, Adame told her he wanted to "pick up some things of his" before going dancing. He directed her down different streets, and eventually into an alley. He then had her park in the side parking lot of 4258 West 63rd Street. The parking lot was four buildings down from Ortiz's apartment.

Adame told Navarette to wait in the car while he went inside to change clothes. At that time, he was wearing a dark hoodie, dark pants, gloves, and sunglasses, even though it was "pitch black" at the time. He left with his backpack and walked into the alley towards Ortiz's apartment. Navarette waited in the car for two hours, and eventually fell asleep. When she awoke, she texted Adame asking where he was. He came back to the car 15 to 20 minutes later, still wearing the same outfit,

but he had two full garbage bags with him. He told Navarette to "start driving" and did not answer her when she asked where he had been. They decided it was too late for dancing, and so Adame had Navarette drive him home.

At trial, the government presented the items recovered from the garbage bags, which Ortiz identified as her possessions from both her home in Indiana and her apartment in Chicago.

In addition, the government presented testimony from the law enforcement personnel who investigated the arson. John Gamboa, an ATF Certified Fire Inspector, testified that he investigated Ortiz's apartment on January 14, 2012. He discovered that the fire originated at three different points; one in the living room, and two separate areas in the bedroom. Kevin Smith, an Arson Investigator for the Illinois State Fire Marshall, testified that he inspected the apartment on January 14, 2012, and found that an "accelerant" was poured in three areas; one in the living room and two in the bedroom. The Illinois State Police Forensic Science Center then tested the samples from those three areas. Several samples came back "inconclusive" (meaning there *may* have been an ignitable liquid present), but one sample was determined within a "reasonable degree of scientific certainty" to contain gasoline.

The government also introduced statements that Adame made during his interrogations by the ATF and Chicago Police. ATF Agent Anthony Zito interviewed Adame on January 31, 2012. Adame initially told Agent Zito that on the evening of the fire he called his uncle after he left Ortiz's house, and his uncle picked him up and brought him back to the area near the

intersection of North Avenue and Keeler Avenue in Chicago, where the uncle resided. Following the interview, Agent Zito discovered that Adame's uncle did not live at that location. He called the uncle's phone number that Adame provided, but the phone was disconnected. Finally, he reviewed Adame's cell phone records, which indicated that Adame did not call his uncle on the evening of the fire.

Sergeant Jose Garcia of the Chicago Police Department's Arson Section also interviewed Adame. Adame initially told Sergeant Garcia that he was at his uncle's residence on the evening of the fire, but he recanted this story when confronted with the evidence to the contrary. Adame then admitted he was at Navarette's residence that evening. Adame also claimed that he drove to Navarette's residence in a truck, but later admitted he drove a Mustang. He admitted directing Navarette to the gas station and that he pumped the gas. When Sergeant Garcia asked Adame, "you really didn't pump gas into the car, did you?" Adame looked down and shook his head from side to side. When Sergeant Garcia asked him why he directed Navarette to the gas station, Adame replied, "I can't tell you why." When Sergeant Garcia asked him why he went into Ortiz's apartment that night, Adame responded, "I can't tell you why, I can't tell you why." When Sergeant Garcia asked him what items he took from Ortiz's apartment, Adame initially denied taking anything, but after Sergeant Garcia confronted him with the evidence, Adame said, "I can't tell you what I did." Finally, Sergeant Garcia asked whether Adame "set the fire to try and hurt Jimmy [Maca]," to which Adame stated, "I didn't mean to hurt Jimmy."

The government called Special Agent Joseph Raschke of the Federal Bureau of Investigation ("FBI") to testify regarding historical cell site analysis. Agent Raschke described how cell phones interact with cell towers. Basically, whenever a cell phone makes a call, it sends the information to a cell tower, which transmits the information to the phone being called. Agent Raschke created a map of all the eligible cell towers in the Chicago area. He testified that cell phones generally send information to whichever cell tower is closest, but not always because different factors can affect the signal. By using historical cell site analysis, he could determine "the approximate area where a phone would have had to have been when it placed or received the call in the records."

Agent Raschke then testified regarding his analysis of Adame's and Navarette's cell phone data from the evening of January 13, 2012, through the morning of January 14, 2012. He cautioned that the records are not precise enough to state whether a phone "was absolutely at a specific address," but that he could determine whether "it was in [a general] area." Agent Raschke testified that the cell phone data was "consistent with" Adame's phone traveling from Indiana to Chicago on January 14, 2012, from 12:21 a.m. to 12:48 a.m. He stated that Adame's cell phone records were also "consistent with" Adame being at or near Navarette's residence on January 14, 2012, from 1:08 a.m. to 1:15 a.m.; and Navarette's friend's residence around 2:05 a.m.

Agent Raschke also testified that he has an FBI software package that allows him to determine what cell tower a cell

phone is currently using.[1] Agent Raschke had gone to the crime scene with a cell phone and used the software to determine what cell tower the cell phone communicated with while he was in the area. He tested different locations near the crime scene, such as the alley behind the building, and inside Ortiz's apartment. Based on the cell towers that Agent Raschke's cell phone communicated with while at those locations, he concluded that Adame's cell phone records were "consistent with" Adame being in or near Ortiz's apartment on the evening of the fire because the cell tower that Agent Raschke's cell phone utilized when he was inside the apartment matched the cell tower that Adame's cell phone utilized for the calls that he made on January 14, 2012, between 2:47 a.m. and 3:12 a.m. Further, Agent Raschke testified that Adame's cell phone data did not indicate that Adame's cell phone utilized any of the cell towers near the intersection of North Avenue and Keeler Avenue at any point during the evening of the fire. While Agent Raschke stated that he could not "say that a phone was at a specific address," he could confidently say that a phone "wasn't at this specific address."

---

[1]   As to any concern with whether Agent Raschke's testimony regarding the software established a proper foundation of reliability: Agent Raschke never testified who developed the software, what company furnished the software (if the software was even proprietary), and whether the software operated the same way for every model and type of cell phone. Agent Raschke also testified that he did not think any law enforcement group, other than the FBI, utilized the software. But Adame never objected to the software's reliability, so the district court did not inquire further. Nevertheless, any deficiencies in this evidence are at most harmless error.

Agent Raschke testified that Navarette's cell phone records were "consistent with" Navarette being at or near her residence and her friend's residence during the evening of the fire and that the data was "consistent with" her being at or near the parking spot near Ortiz's apartment on January 14, 2012, from 3:02 a.m. to 3:16 a.m. Agent Raschke concluded that Navarette's cell phone records were "inconsistent" with Navarette being inside Ortiz's apartment at that time. He also found that Adame's cell phone records were "inconsistent" with Adame being in the parking spot with Navarette during that time frame. This was because the cell towers that Agent Raschke's phone communicated with when he examined the software inside the apartment were different from the cell towers his phone communicated with when he was outside the apartment at the alley parking spot. The cell phone records showed that *Navarette's* phone connected with the towers that Agent Raschke's phone connected with when he was in the parking spot; and *Adame's* phone connected with the towers that Agent Raschke's phone connected with when he was in the apartment.

### C. Jury Deliberations

After closing arguments, the district court went through the exhibits that had been entered into evidence and allowed the parties to object to any of them going back into jury deliberations. Adame objected to several items, including a video from Adame's cell phone. The video was recorded by Adame and shows Ortiz lying in bed while Adame films her and remarks that the sun on her skin made it look red, like she was "on fire." Adame did not object to the government introducing the video into evidence during trial, but argued

that it was improper to allow it to go back to the jury now because they could "view it over and over again to an incorrect result." Specifically, he argued the word "fire" was prejudicial because the video was taken almost three weeks before the arson and he believed the word "fire" clearly had other meanings in this context. The district court allowed the video to go back into the jury room along with most of the other exhibits that were admitted during trial.

The jury returned a guilty verdict against Adame on October 11, 2013. On January 8, 2015, the district court sentenced Adame to 40 years' imprisonment.

## II. DISCUSSION

Adame appeals on two major grounds. First, he claims that there was insufficient evidence to convict him under 18 U.S.C. § 844(i). Second, he argues that evidence was admitted improperly, which substantially prejudiced him and prevented a fair trial. We address each separately.

### A.  Sufficiency of the Evidence

We will only overturn the jury's verdict if, in viewing the evidence in the light most favorable to the government, "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Stevenson*, 680 F.3d 854, 855–56 (7th Cir. 2012) (citation omitted). Adame raises two issues to support his sufficiency of the evidence argument. First, Adame claims that the government failed to prove that Adame poured gasoline in Ortiz's apartment and then ignited the fire. Although Navarette testified that Adame was at the gas station and pumped the gas, Adame

argues that since she did not see Adame pump gas into a container or smell gasoline, there was insufficient evidence connecting him to the fire.

Arson can be proven by circumstantial evidence. *E.g.*, *United States v. Thompson*, 523 F.3d 806, 812 (7th Cir. 2008) (citation omitted). As detailed above, there is a considerable amount of circumstantial evidence indicating that Adame caused the fire. The jury could have reasonably inferred that Adame pumped the gasoline into a container, since Navarette testified that she did not see the gas nozzle while Adame was pumping gasoline. Further, the jury could have reasonably inferred that Adame put the container in his backpack, which he carried with him as he left the car after he had Navarette park near Ortiz's apartment. Finally, the jury could have reasonably inferred that Adame poured the gasoline in the area inside Ortiz's apartment where gasoline was later detected, and that these events occurred during the two hour time period in which Navarette waited for Adame, before he returned with garbage bags full of items from Ortiz's apartment. So, there was sufficient circumstantial evidence for the jury to find beyond a reasonable doubt that Adame started the fire.

Second, Adame claims that there was insufficient evidence to convict him because the government did not show that the building at issue substantially affected interstate commerce. 18 U.S.C. § 844(i) states that:

> Whoever maliciously damages or destroys, or
> attempts to damage or destroy, by means of fire
> or an explosive, any building … used in inter-

state or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned.

If the government presents evidence that the building at issue is used as rental property, then the government satisfies its evidentiary burden for the interstate commerce element under § 844(i). *United States v. Soy*, 413 F.3d 594, 602–03 (7th Cir. 2005) (discussing *Russell v. United States*, 471 U.S. 858, 862 (1985) and its progeny); *see also Taylor v. United States*, _ S. Ct. _, 2016 WL 3369420, at *6 (June 20, 2016) (holding that to satisfy the commerce element under the Hobbs Act for the robbery or attempted robbery of a drug dealer, the government did not have to show that the drugs at issue traveled interstate, but rather "it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds, for, as a matter of law, the market for illegal drugs is 'commerce over which the United States has jurisdiction.'").

At trial, the owner of the building testified that the first floor was used for office space that was available for lease at the time of the fire. He also stated that the second floor was split into two residential apartments, both of which were leased at the time of the fire. Further, the landlord said he had never lived in the building. The government met its evidentiary burden to establish the interstate commerce element under § 844(i).

### B. Improperly Admitted Evidence

Adame also argues that several pieces of evidence were improperly admitted at trial. Specifically: (1) Agent Raschke's expert testimony regarding historical cell site analysis; (2) an

incriminating statement Adame made during interrogation that he "didn't mean to hurt Jimmy"; and (3) the cell phone video of Adame remarking that Ortiz's skin looked like it was "on fire" that went back to the jury room during deliberations. We address each separately.

### 1. Expert Testimony Regarding Historical Cell Site Analysis

Adame challenges the admissibility of Agent Raschke's historical cell site analysis under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The government argues that Adame's *Daubert* challenge was waived because Adame did not file a motion to suppress prior to trial.

In *United States v. Acox*, we stated that parties must file a pretrial motion to exclude evidence if there is an applicable constitutional or statutory rule "*outside* the Rules of Evidence" that justifies the exclusion; for example, the *Miranda* doctrine. 595 F.3d 729, 733 (7th Cir. 2010) (emphasis in original) (citations omitted). But parties may move to exclude evidence during trial if the Federal Rules of Evidence justify the exclusion. *Id.* (citing Fed. R. Evid. 103(a)(1)). *Daubert* objections are synonymous with objections based on Federal Rule of Evidence 702. Therefore, Adame did not have to file a pretrial motion to suppress, and could have raised the issue during trial. Adame timely raised a *Daubert* objection, and we turn to the merits of his argument.

We review *de novo* whether a district court properly applied the *Daubert* analysis. *E.g.*, *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) (citations omitted). If the district court properly

applied the *Daubert* analysis, then "we will not disturb the district court's findings unless they are manifestly erroneous." *Id.* (citation omitted). But, if the district court failed to conduct a *Daubert* analysis, then we review *de novo* whether the expert's testimony was admissible under Federal Rule of Evidence 702. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). In this case, the district court did not conduct a *Daubert* analysis.[2] So, we examine *de novo* whether Agent Raschke's testimony regarding historical cell site analysis was admissible.

We recently examined the admissibility of historical cell site analysis under Federal Rule of Evidence 702. *See United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016). In *Hill*, we noted that "historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood." *Id.* at 298. But we noted that the expert witness should include a "disclaimer" regarding the accuracy of the analysis, and that the witness should not "overpromise[] on the technique's

---

[2] While the district court did acknowledge Adame's *Daubert* objection, it overruled the objection on the ground that since other federal courts have allowed testimony on historical cell site analysis, "that's the end of it." This is an insufficient analysis to warrant any deference. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) ("the district court's one sentence, stating that Prof. Anthony has sufficient expertise, is not enough to show that the district court applied the *Daubert* standard"); *see also Chapman v. Maytag Corp.*, 297 F.3d 682, 687–88 (7th Cir. 2002) (reversing district court's admission of expert testimony when the court "conducted virtually no *Daubert* analysis").

precision—or fail[] to account adequately for its potential flaws." *Id.* at 298-99.

In this case, Agent Raschke acknowledged that he was unable to tell from his historical cell site analysis whether Adame was at a "specific address" at any point during the evening of the fire. Rather, his testimony was that the data was "consistent with" Adame being present at different locations from January 13, 2012, to January 14, 2012. This testimony adheres to our opinion in *Hill* regarding the proper use of historical cell site analysis in trials. Further, Agent Raschke's specificity in his testimony that the data was consistent with Adame being present in Ortiz's apartment while Navarette was in the parking spot (and inconsistent with Adame being in the parking spot and Navarette being in the apartment) was adequately supported by his observations that cell phones at those two different locations utilized different cell towers, despite their close proximity.

However, we need not engage in a *Daubert* analysis to resolve this case. Even assuming Agent Raschke's historical cell site analysis testimony was inadmissible, any error was harmless. If an error occurred in a jury trial, the government's burden is to persuade us that "the jury would have convicted even absent the error." *United States v. Ortiz*, 474 F.3d 976, 982 (7th Cir. 2007). We are persuaded that the jury would have still convicted Adame absent the historical cell site analysis testimony because Agent Raschke's testimony was corroborated by other witnesses and evidence presented at trial. *See Naeem*, 444 F.3d at 609 (finding improperly admitted expert testimony did not violate appellant's "substantial rights"

because all of the expert's objectionable statements were corroborated by other witnesses).

The crux of Agent Raschke's testimony was that on the night of the fire, Adame drove from Indiana to Chicago; was in the general area of Navarette's residence; was in the general area of Navarette's friend's residence; was in the general area of Ortiz's apartment; and was not in the general area of the intersection of North Avenue and Keeler Avenue. He also testified that Navarette's cell phone data indicated that she was in the general area of her residence, her friend's residence, and the parking spot near Ortiz's apartment.

All of Agent Raschke's testimony was cumulative; it was corroborated by other witnesses at trial. Ortiz testified that Adame was at her residence in Indiana earlier that evening, and Navarette testified that Adame picked her up in Chicago later that evening. These statements corroborate Agent Raschke's testimony that Adame drove from Indiana to Chicago on the night of the fire. Navarette also testified that Adame came to her residence and that they went to her friend's house to pick up a car. Further, Navarette testified that she parked the car in an area a few buildings down from Ortiz's apartment, and that Adame left the vehicle and started walking towards the alley in the direction of Ortiz's apartment. Adame returned with garbage bags full of items, which Ortiz identified during trial as being from her home in Indiana and her apartment in Chicago. This corroborates Agent Raschke's testimony that Adame's cell phone data was consistent with him being at Navarette's house, her friend's house, and Ortiz's apartment on the evening of the fire. Finally, the government introduced Adame's statement to investigators in which he

acknowledged that he was not at the intersection of North Avenue and Keeler Avenue on the evening of the fire.

Therefore, since all of Agent Raschke's testimony regarding Adame's locations throughout the evening was cumulative, any possible error in admitting his historical cell site analysis was harmless.

### 2. Incriminating Statements

Adame also challenges the government's admission of his statement, "I didn't mean to hurt Jimmy." He claims that it was elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). But Adame did not file a pretrial motion to suppress this statement, nor did he file a motion for relief in the district court. If a defendant fails to file a pretrial motion to suppress, then he or she must file a motion for relief in the district court showing "good cause" for why the district court should excuse the timeliness issue. *See United States v. Daniels*, 803 F.3d 335, 351–52 (7th Cir. 2015); *see also* Fed. R. Crim. P. 12(c)(3). If the defendant also fails to file a motion for relief showing good cause before the district court, then we apply a hyper-deferential standard of review in which we examine "whether, *if* a motion for relief had been made *and* denied, the district court *would have* abused its discretion in concluding that the defense lacked good cause." *Acox*, 595 F.3d at 732 (emphasis added).

Adame argues *if* he made a motion for relief *and* the district court denied it for lack of good cause, *then* the district court would have abused its discretion because the phrase presented at trial ("I didn't mean to hurt Jimmy") materially differed from the statements disclosed to Adame prior to trial ("[I] had no problems with Jimmy" and "[I] was not trying to hurt

Jimmy"). Thus, he essentially claims he was blind-sided by Sergeant Garcia's altered testimony during trial, which prevented him from filing a pretrial motion to suppress. In addition, he argues the phrase presented at trial is materially different from the phrases previously disclosed to him because the phrase "I didn't mean to hurt Jimmy" contains an implicit acknowledgment of causing the fire and not intending the consequences that ultimately resulted.

The fatal flaw in Adame's argument is that the statements he claims were previously disclosed to him before trial are not contained in the record. Adame also did not file a motion to modify the record pursuant to Federal Rule of Appellate Procedure 10(e). "A court of appeals is limited to the record built in the district court, so arguments that depend on extra-record information have no prospect of success." *Acox*, 595 F.3d at 731. Absent a complete record containing the previously disclosed statements that Adame relies on, we cannot consider this argument.

Further, Adame's argument fails on its merits. If there is any meaningful difference between the phrases "I didn't mean to hurt Jimmy" and "I was not trying to hurt Jimmy," it is not clear to us. So we cannot say that the district court, had it failed to grasp the difference, would have abused its discretion.

### 3. Cell Phone Video

Adame's final argument is that the district court erred in allowing the cell phone video to go back to the jury room. Adame claims that the video was unfairly prejudicial under Federal Rule of Evidence 403 because his statement that the

sunlight on Ortiz's skin made it look like it was "on fire" could have been misinterpreted by the jury.

We review a district court's decision to allow exhibits into the jury room during deliberations for a "clear abuse of discretion." *United States v. Loughry*, 738 F.3d 166, 169–70 (7th Cir. 2013) (citation omitted). Further, "[i]f a party argues that properly admitted exhibits had some sort of improper influence on the jury, reversal also requires a showing of prejudice." *Id.* (citation omitted). Generally, the district court is well within its discretion to allow properly admitted evidence to go back into jury deliberations; but it should prohibit exhibits that "neither party has relied on, that have no relevance to any of the issues central to the case, or that are cumulative, prejudicial, confusing, or misleading." *Deicher v. City of Evansville, Wis.*, 545 F.3d 537, 542 (7th Cir. 2008) (citing Federal Rule of Evidence 403 and *United States v. Gross*, 451 F.2d 1355, 1359 (7th Cir. 1971)).

Both parties agree that the cell phone video was properly admitted into evidence and that Adame did not object to its introduction. Thus, it is normally proper for a district court to allow the exhibit to go into the jury deliberation room.

But Adame raised a proper objection under Federal Rule of Evidence 403 that the video's unfair prejudice substantially outweighed its probative value. He claims that any reference to "fire" by an arson defendant is inherently prejudicial. We disagree. It would be unnecessarily stringent to hold that the prosecution can never introduce evidence of an arson defendant saying the word "fire" without unfairly prejudicing the defendant and requiring a new trial. Adame also speculates

that the jury could have replayed the video over and over again until it was given too much credence. That risk alone is not enough to require us to reverse the verdict; there was an overwhelming amount of other evidence introduced against Adame in this case. Thus, any error was harmless and did not prejudice Adame.

### III.  CONCLUSION

Therefore, for the foregoing reasons, Adame's conviction is AFFIRMED.