RENDERED: AUGUST 24, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

2015-SC-000337-MR

KYLE SHEA HOLBROOK     APPELLANT

ON APPEAL FROM MORGAN CIRCUIT COURT
V.     HONORABLE REBECCA K. PHILLIPS, JUDGE
NO. 15-CR-00008

COMMONWEALTH OF KENTUCKY     APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

**AFFIRMING**

Appellant, Kyle Shea Holbrook, appeals as a matter of right from a judgment of the Morgan Circuit Court sentencing him to twenty years' imprisonment for murder and tampering with physical evidence. Holbrook alleges that the trial court erred in five ways: 1) by permitting expert testimony about historical data analysis of cell phone and cell tower records; 2) by allowing two witnesses to opine that Holbrook was lying or that he was guilty; 3) by permitting the Commonwealth to introduce photographs depicting the victim's body; 4) by authorizing the admission of hearsay statements made by Holbrook; and 5) by instructing on complicity to murder. Also, Holbrook contends that he was prejudiced and denied due process of law by the Commonwealth allegedly defining reasonable doubt during voir dire. For the

following reasons, we affirm the judgment and sentence of the Morgan Circuit Court.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2011, Matthew Harris discovered Dillon Bryant's body floating in a pond on the two-hundred-acre Holbrook family farm. A month prior, Bryant had been reported missing by his sister after she was unable to get in contact with him. When the authorities arrived on the scene, Harris informed them that after Bryant's disappearance in late February or early March he observed tire tracks leading to one pond, backing out, and then heading to the pond in which the body was found. The pond where the body was recovered was approximately a mile away from Holbrook's residence. Despite the advanced level of decomposition, the body was ultimately identified as that of Bryant. Medical examination of Bryant's body revealed that he had been shot twice, once in the head and the other in the upper back.

Holbrook was interviewed by police both as part of their investigation into Bryant's disappearance and again later as part of the murder investigation. In his statements to the police, Holbrook claimed that Bryant had informed him of an altercation that had occurred with Francisco Camacho and Evan Ratliff a week before he was reported missing. The root of the altercation was Bryant's effort to convince his former girlfriend to leave Camacho's home where she had been residing. Camacho took exception to Bryant's efforts and they had an argument outside his residence. When Bryant left Camacho's residence, Camacho followed him. After running the vehicle

2

Bryant was in off the road, Camacho confronted and argued with Bryant at a gas station and later at a home belonging to Greg Creusen.

Holbrook also informed police that the day after this dispute, he picked up Bryant and they went to his residence to use narcotics. Bryant discussed his plan to make sham cocaine and rip someone off. Later Bryant was picked up in a grey or silver sedan, but Holbrook said that he did not know who was driving the vehicle. Holbrook claimed that this was the last time that he saw Bryant.

Two years later, in April 2013, Holbrook was indicted by the Elliott County grand jury for murder and tampering with physical evidence. Prior to trial the indictment was amended to include complicity liability to the murder charge. After Holbrook successfully petitioned for a change of venue, the case was tried in February 2015, in Morgan County.

Multiple witnesses testified at trial about statements Holbrook allegedly made to them about his involvement with Bryant's disappearance. Justin Conn testified that Holbrook told him that Bryant was killed by Camacho and that the body had been placed in the pond to set him up. Conn also explained that Holbrook had told him that Camacho had offered him money to bring Bryant to him, but Holbrook said that he would never do that. Similarly, Odie Robinson testified that several weeks prior to Bryant's disappearance, Holbrook informed him that Camacho had offered him money to bring Bryant to him. Robinson explained that Holbrook told him that he refused to entertain such a

3

proposition.[1] Later, after Bryant's disappearance, Robinson noticed that Holbrook had a great deal of money.

The jury also heard testimony from Brian Stacy. Stacy explained that he had purchased narcotics from Holbrook in the past. After getting out of jail, Stacy approached Holbrook to purchase cocaine. Holbrook informed Stacy that he was unable to procure the drugs. Specifically, he claimed that "he wasn't messing with those people anymore" and that someone ended up dead. Stacy was uncooperative during questioning and denied informing Kentucky State Police (KSP) Detective Gardner about statements allegedly made by Holbrook to him. Subsequently, Detective Gardner testified that Stacy informed him that Bryant owed Camacho $2,600 and when he failed to pay, Camacho ordered Holbrook to seize Bryant. Afterwards, Holbrook brought Bryant to where Ratliff and Camacho were, and the pair murdered him.

Additionally, Tony Lewis, who was incarcerated with Holbrook for several months in 2012-2013, informed the jury that based on his discussions with Holbrook, Holbrook believed that he had gotten away with murdering Bryant. According to Lewis, Holbrook had an altercation with Bryant. Also, in a statement made to KSP Detective Royce Collett, Lewis claimed that Holbrook murdered Bryant to erase a debt owed to Camacho.

---

[1] Robinson also testified about an earlier conversation that he had with Holbrook, in which Holbrook admitted to receiving money from Camacho, which he split with Bryant.

4

Subsequently, Holbrook was found guilty of all charges. The jury recommended twenty years' imprisonment for murder and three years' imprisonment for tampering with physical evidence. The jury recommended that those sentences be served concurrently for a total sentence of twenty years' imprisonment. The trial court sentenced Holbrook in conformance with the jury's recommendation. Holbrook brings this appeal as a matter of right.

**ANALYSIS**

**I. The Trial Court Did Not Abuse Its Discretion by Permitting the Introduction of Expert Testimony Regarding Historical Data Analysis of Cell Phone and Cell Tower Records.**

Holbrook alleges that the trial court erred by permitting the introduction of expert testimony from Special Agent Kevin Horan of the Federal Bureau of Investigation (FBI). Prior to trial, Holbrook sought to bar Special Agent Horan's testimony about historical data analysis of cell tower and cell phone records contending that his conclusions are scientifically unreliable.

The admissibility of expert testimony is governed by Kentucky Rule of Evidence (KRE) 702. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principle and methods; and

5

(3) The witness has applied the principles and methods reliably to the facts of the case.

KRE 702 was written in light of guidance set forth by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993). *Daubert* requires the trial court to play the role of "gatekeeper" to prevent the admission of "unreliable pseudoscientific evidence." *Miller v. Eldridge*, 146 S.W.3d 909, 914 (Ky. 2004). "[A] trial court's task in assessing proffered expert testimony is to determine whether the testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Futrell v. Commonwealth*, 471 S.W.3d 258, 282 (Ky. 2015) (quoting *Daubert*, 509 U.S. at 597, 113 S. Ct. at 2799). Relevancy, in this setting has been described as one of "fit":

> 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. . . . The study of the phases of the moon, for example, may provide valid scientific [, technical, or other specialized] 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However, (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

*Luna v. Commonwealth*, 460 S.W.3d 851, 864 (Ky. 2015) (quoting *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky. 2000) (alterations in original)). "In making its reliability determination, the trial court must consider 'whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be

6

applied to the facts in issue."' *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 39 (Ky. 2004) (quoting *Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796). To evaluate whether the proffered expert testimony is reliable, a trial court may consider a number of non-exclusive factors such as: "whether the principle, theory, or method in question 'can be (and has been) tested,' whether it 'has been subjected to peer review and publication,' whether it has a 'known or potential rate of error,' and whether it enjoys acceptance within 'a relevant scientific community.'" *Futrell*, 471 S.W.3d at 282 (quoting *Daubert*, 509 U.S. at 593-94, 113 S. Ct. at 2796-97).

"The decisions of trial courts as to the admissibility of expert witness testimony under *Daubert* are generally entitled to deference on appeal because trial courts are in the best position to evaluate firsthand the proposed evidence." *Miller*, 146 S.W.3d at 914. Accordingly, whether a witness qualifies as an expert is reviewed under an abuse of discretion standard. *Id.* The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 581 (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)). However, any factual determinations made by the trial court in evaluating an expert's reliability are reviewed for clear error. *Luna*, 460 S.W.3d at 864 (citing *Hyman & Armstrong P.S.C. v. Gunderson*, 279 S.W.3d 101-02 (Ky. 2008)).

To understand the issues presented in Special Agent Horan's testimony, a brief explanation of the intersection of cell phones and cell phone towers is

necessary. "Cell phones work by communicating with cell-sites operated by cell-phone service providers. Each cell-site operates at a certain location and covers a certain range of distance." *In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F. Supp. 2d 113, 115 (E.D.N.Y. 2011). The geographic area covered by a particular tower depends upon "the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade)." *United States v. Hill*, 818 F.3d 289, 295 (7th Cir. 2016) (quoting Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of A Cellular Phone*, 18 RICH. J.L. & TECH. 3, 5 (2011)).

"When a cell phone user makes a call, the phone generally 'connect[s] to the cell site with the strongest signal,' although 'adjoining cell [towers] provide some overlap in coverage.'" *Id.* "As a cell phone user moves from place to place, the cell phone automatically switches to the tower that provides the best reception." *State v. Johnson*, 797 S.E.2d 557, 562 (W.Va. 2017) (quoting *In re Application of U.S. for an Order for Disclosure of Telecomms. Records & Authorizing the Use of a Pen Register & Trap & Trace*, 405 F. Supp. 2d 435, 436-37 (S.D.N.Y. 2005)).

Due to practical and technical necessity, "cell-phone service providers keep historical records of which cell-sites each of their users' cell phones have communicated." 809 F. Supp. 2d at 115. Review of a cell tower's location data "does not identify a cell phone user's location with pinpoint precision—it identifies the cell tower that routed the user's call." *United States v. Davis*, 785

8

F.3d 498, 515 (11th Cir.), *cert. denied*, 136 S. Ct. 479 (2015); *see also State v. Simmons*, 143 A.3d 819, 825 (Me. 2016) ("[Historical cell-site data] makes it possible to identify at least the general location of a cell phone at the time the phone connects to a tower." A cell user's location "may be further defined by the sector of a given cell tower which relays the cell user's signal, the user may be anywhere in that sector." *Davis*, 785 F.3d at 515.

In the case at bar, the trial court conducted a pretrial hearing to assess Special Agent Horan's qualifications and to examine his analysis and opinions relating to historical cell-site data. During that hearing, the trial court learned that Special Agent Horan has been employed by the FBI for nineteen years and is a member of the Bureau's Cellular Analysis Survey Team (CAST). CAST was created to analyze various historical records associated with the use of cell phones including cell phone records, tracking cell phones through cell tower records, and analyzing cell phones. CAST agents undergo one month of training, along with continuing education and updates from professionals in the cell phone industry. Additionally, Special Agent Horan attended a specialized training known as the Project Pinpoint School where he concentrated on cellular analysis and tracking. Based on the foregoing, the trial court concluded that Special Agent Horan was an expert.

Subsequently, Special Agent Horan explained that cell phones are essentially radios, as they use radio signals to contact cell towers. Each tower is unique and has identifiers that allow cell providers to determine what specific tower a phone communicated with during the logged activity. Most cell

towers are engineered to cover a 360-degree radius which is typically broken down into three sectors. When a user makes a phone call, the cell phone connects to the tower and sector with the strongest signal, which is often, but not always, the closest tower to the caller. Through reviewing cell phone records, which reflect which tower a phone connects to at a specific date and time, Special Agent Horan could determine the general location of a phone at a particular time. By determining the cell phone tower and sector, Special Agent Horan can identify a general area or "footprint" within which the phone was located at a given time.

To identify the exact boundaries of the "footprint," Special Agent Horan would typically perform a "drive test," wherein he would drive the area to identify the exact size of the "footprint." However, Special Agent Horan did not perform a drive test in this case due to the passage of time. Special Agent Horan explained that a drive test conducted in 2013 or 2014 would not yield accurate information as to the "footprint" of the tower as it existed in 2011, due to software and hardware changes. Also, he noted that while a drive test is the best way to refine the coverage area, the general principles of coverage apply regardless.

After hearing Special Agent Horan's proffered testimony, the trial court determined that:

> [Special Agent Horan's] testimony is based upon the technology and analysis system which is the industry standard. His methods of analysis have been repeatedly utilized with success and were developed by and taught by industry members. His testimony is reliable, relevant, and of assistance to the trier of fact.

10

> Without question, the concerns which drive a *Daubert* analysis do not exist herein. This is not 'junk science' or 'junk technology' for this is the methodology of the industry itself. More importantly, this is not some technique devised by [Special] Agent Horan that is untested and unacknowledged. [Special] Agent Horan is simply interpreting that which was created by the industry using the guides the industry gave him to use in interpretation.

Accordingly, the trial court denied Holbrook's motion to exclude Special Agent Horan's testimony.[2]

At trial, after establishing his credentials, Special Agent Horan explained to the jury how cell phones and cell towers generally interact and how this information is recorded in cell phone records. Specifically, Special Agent Horan testified that each cell tower has three sectors, that a cell phone when accessing a cell tower only accesses one sector, and that access is reflected in that cell phone's records.

Special Agent Horan then explained to the jury that a review of the phone records in the case established that on March 1, 2011: 1) Bryant's cell phone accessed cell towers' sectors 43062 and 43074; and 2) Holbrook's cell phone accessed the same two cell towers' sectors as Bryant along with two different towers. While Special Agent Horan identified that both Bryant and Holbrook accessed the same cell towers' sectors, he was unable to identify the exact boundaries of the cellular "footprint." Further, Special Agent Horan explained

---

[2] The trial court, in its order denying Holbrook's motion, noted that Holbrook had retained an expert in the field of cell phone technology, but that witness did not testify at the hearing. No explanation was offered to the trial court as to why the expert did not testify.

11

he was unable to conclude whether Bryant's cell phone was stationary within the "footprint" or moving or that phone's relation to Holbrook's cell phone.

Special Agent Horan also testified that an analysis of cell phone records for Camacho and Ratliff established that: 1) from February 28, 2011, through March 1, 2011, Camacho's phone did not touch the same sectors as Holbrook's or Bryant's phones; and 2) Ratliff's phone was traveling east to west beginning on February 28, 2011, with the phone ultimately being located in Texas on March 1, 2011.

Holbrook contends that the admission of Special Agent Horan's testimony was error and claims that "the trial court paid lip service to the factors that can be considered in *Daubert* analysis." Holbrook argues that the trial "court relied on the fact that the 'industry' was involved to serve as a safeguard. Yet that is effectively allowing the industry to police itself." However, the trial court rightly noted that the methodology and technology employed by Special Agent Horan came from the cell phone industry to allay concerns that the proffered testimony was nothing more than pseudoscientific evidence.

Holbrook relies on an unpublished opinion from the United States Court of Appeals for the Sixth Circuit, *United States v. Reynolds*, 626 Fed. Appx. 610 (6th Cir. 2015), to state that "the trial court's reliance on 'the industry' in its order is flawed." Holbrook does not explicitly state why *Reynolds* supposedly casts doubt on the scientific process employed in this case. Rather, Holbrook simply quotes a significant portion of *Reynolds* without providing the necessary

12

analysis to demonstrate how *Reynolds* applies to this case. In *Reynolds*, the Sixth Circuit noted federal courts had disagreed about the "reliability of using historical cell-site analysis to determine a caller's location as being in a specific cell-sector." *Id.* at 617. However, *Reynolds* did not serve to resolve that disagreement, as historical cell-site analysis was only used to identify a cell sector where callers were *not* present. *Id.*

While *Reynolds* does not address the issue before this Court, namely the propriety of historical cell-site analysis to identify where callers were present, the United States Court of Appeals for the Seventh Circuit did so in *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016). First, although it is acceptance within the field of expertise, not judicial acceptance, that is paramount in assessing expert testimony, the *Hill* Court explained that "[d]istrict courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so." 818 F.3d at 297 (citing *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C. 2013) (collecting cases)). Second, the *Hill* Court determined that the district court did not abuse its discretion in permitting the introduction of historical cell-site analysis to prove the location of a cell phone user charged with robbery of a credit union. The Court noted that the "science is well understood" and "the technique [of cell phone location analysis] has been subjected to publication and peer criticism, if not peer review." *Id.* at 298. However, the *Hill* Court did note that caution was warranted in the introduction of this material, namely identifying "the level of

13

precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time." *Id.* at 299.

We agree with the *Hill* Court, that the admission of historical cell-site evidence to establish an individual's location is a matter to be assessed carefully. Critically, Special Agent Horan's testimony expressly identified limitations in the scientific techniques he employed. Specifically, when asked about a particular call made by Bryant, Special Agent Horan explained that he was unable to identify the exact boundaries of the phone's "footprint" during the time of that call. Further, Special Agent Horan's testimony only established the general locations of the callers, rather than asserting the callers were at a fixed position. With these caveats established, Special Agent Horan's testimony permitted the jury to infer that Holbrook was near Bryant around the time that he disappeared. This testimony was relevant and probative and as such its admission was not an abuse of the trial court's discretion.[3]

_____

[3] Holbrook also contends that as the use of historical data has not been subjected to peer review that it was inappropriate for the trial court to permit the introduction of this evidence. Contrary to Holbrook's argument, whether a scientific theory or method has been subjected to peer review is not dispositive as to whether that evidence should be admitted. Rather, the trial court takes a broader view to determine whether the underlying theory or methodology is scientifically valid. Clearly, Special Agent Horan's historical cell-site analysis meets this criterion. In particular as noted by the trial court, the methodology that was created by the cell phone industry, "has been tested repeatedly through application to actual cases. Such application has lead (sic) to successful apprehension and prosecutions, which certainly speaks to the accuracy of the methodology." *See also Hill,* 818 F.3d at 297-99.

14

## II. The Trial Court's Admission of Detective Bowling's Statement Was Harmless Error.

Holbrook claims that KSP Detective Bowling improperly characterized him as a liar.[4] The trial court's admission of Detective Bowling's testimony is reviewed for an abuse of discretion. *Meskimen v. Commonwealth*, 435 S.W.3d 526, 534 (Ky. 2013) (citing *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007)).

During Detective Bowling's direct examination, the prosecutor inquired about his interview of Holbrook, which occurred the day Bryant's body was recovered. Detective Bowling relayed what Holbrook had told him—that there had been a call on the Holbrook home phone, Holbrook did not recognize the caller, and handed the phone to Bryant who took the call. Subsequently, Detective Bowling was asked about his impressions of Holbrook concerning the phone call. Over Holbrook's objection, the trial court permitted Detective Bowling to testify as to Holbrook's demeanor, any inconsistencies, or observations. Detective Bowling then said, "I advised him I didn't think he was being truthful and I don't think he was being truthful."[5]

---

[4] Holbrook contends that the admission of this evidence violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Sections Two, Seven, Eleven, and Fourteen of the Kentucky Constitution.

[5] Holbrook objected to the second portion of Detective Bowling's statement and requested that it be stricken from the record and that a limiting instruction be given to the jury. The trial court noted that Detective Bowling was permitted to explain his interrogation techniques and what he said to Holbrook during his interview, but that it would be inappropriate for him to comment on Holbrook's truthfulness. The trial court explained that it was difficult to assess the context of the statement as Detective Bowling did not say much. Ultimately, the trial court was unsure that Detective Bowling had commented on Holbrook's truthfulness and as such overruled the objection. Also, the trial court reiterated that if Detective Bowling in his subsequent

15

"With few exceptions, it is improper to require a witness to comment on the credibility of another witness. A witness's opinion about the truth of the testimony of another witness is not permitted." *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky. 1997) (quoting *State v. James*, 557 A.2d 471, 473 (R.I. 1989)). Conclusions about the truth of the testimony of witnesses is ultimately "within the exclusive province of the jury." *Id.* We reiterated these principles, set forth in *Moss*, eight years later in *Lanham v. Commonwealth*, 171 S.W.3d 14, 23 (Ky. 2005), by saying that "it is generally improper for a witness to characterize the testimony of another witness as 'lying' or otherwise."

However, the *Lanham* Court went on to create an exemption from this general rule by upholding the admission of an unredacted audio recording of a police interrogation, in which the officer accused the defendant of lying. *Id.* at 28-29. "The full statement, complete with the interrogator's comments on the defendant's veracity and 'shifting, inconsistent story' was admissible, we held, not as an expression of the interrogator's actual opinion about the defendant's credibility, but as a verbal act providing context for the suspect's responses." *Walker v. Commonwealth*, 349 S.W.3d 307, 311 (Ky. 2011) (quoting *Lanham*, 171 S.W.3d at 19).

While *Lanham* concerned a recorded statement, as opposed to live testimony from a law enforcement officer, *Lanham*'s general principles are

---

Bowling had commented on Holbrook's truthfulness and as such overruled the objection. Also, the trial court reiterated that if Detective Bowling in his subsequent testimony were to comment on Holbrook's truthfulness that she would sustain defense objections to that portion of his testimony.

16

applicable in the case at bar. In his testimony, Detective Bowling explained the course of his interview with Holbrook. This included his discussion of interrogation techniques—namely, his telling Holbrook that he did not believe that he was being truthful. Detective Bowling's discussion of an interrogation technique was not admitted to establish that Holbrook was a liar, but rather to explore his actions during the interrogation. As such there was no error in the admission of the portion of Detective Bowling's statement, where he said that "I advised him I didn't think he was being truthful . . . ."

However, the remainder of Detective Bowling's statement, "and, I don't think he was being truthful[,]" was an impermissible comment on Holbrook's truthfulness. This comment did not provide explanation or context for Detective Bowling's interview with Holbrook, rather it was simply an opinion on Holbrook's credibility, which ran afoul of the principles articulated in *Lanham* and *Moss*. As such, the trial court abused its discretion by permitting the admission of this portion of Detective Bowling's statement.

While the admission of the statement was error, we conclude that the error was harmless. "A non-constitutional evidentiary error may be deemed harmless, the United States Supreme Court has explained, if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S. Ct. 1239 (1946)). The fundamental question is "whether the error itself had substantial

influence [on the result]. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* (quoting *Kotteakos*, 328 U.S. at 765).

In finding harmless error, we note that the statement compromised a tiny portion of Detective Bowling's testimony. Moreover, the statement must be viewed in the context of the entirety of Holbrook's trial, which lasted approximately two weeks and featured the testimony of approximately forty-one prosecution and defense witnesses. Additionally, Detective Bowling's opinion that Holbrook was not being truthful in his recounting of receiving a phone call, not knowing who the caller was, and handing the phone to Bryant, was not of critical importance to the resolution of the case. Detective Bowling's opinion which cast doubt on this one small portion of Holbrook's story, did not address the ultimate issue in the case, namely the guilt or innocence of Holbrook. Further, while we do not condone police officers opining as Detective Bowling did in this case, we understand, as do lay jurors, that criminal charges are unlikely to be initiated against a defendant if police believe the whole of a defendant's explanation regarding the facts and circumstances surrounding the crime. In light of these considerations, we cannot say that the judgment was substantially swayed by the erroneous admission of Detective Bowling's statement regarding Holbrook's explanation of the phone call.[6]

---

[6] Holbrook also raises two other errors concerning police testimony in his trial. During Holbrook's cross-examination of Detective Bowling, he asked whether Detective Bowling's statement about his truthfulness was an interrogation technique. Detective Bowling answered that he did not think Holbrook was being truthful, based on his narrative of his last encounter with Bryant. Subsequently, Holbrook's objection to Detective Bowling's response was overruled. Contrary to Holbrook's argument, the trial court did not err in permitting Detective Bowling's response to Holbrook's

18

## III. The Trial Court Did Not Abuse Its Discretion in Admitting Photographs of Bryant's Body.

Holbrook also alleges that the trial court erred in permitting the jury to view photographs of Bryant's body.[7] During the trial, the Commonwealth introduced eighteen photographs depicting the recovery of Bryant's body from the pond. These photographs also demonstrated the condition of Bryant's body and how it had been weighed down with concrete blocks and straps to remain submerged in the pond. Later, the Commonwealth introduced sixteen photographs of the autopsy of Bryant's body. Holbrook contends that the admission of these photographs was erroneous as they "aroused the passions of the jury." The trial court's admission of this evidence is reviewed under an abuse of discretion standard. *Meskimen*, 435 S.W.3d at 534.

In order to evaluate the admissibility of the photographs, the Court must determine if the probative value of the evidence was substantially outweighed by its prejudicial effect. *Adkins v. Commonwealth*, 96 S.W.3d 779, 794 (Ky.

---

question. Holbrook's question to Detective Bowling about his interrogation techniques was obviously imprudent, in that it allowed Detective Bowling to offer an opinion on Holbrook's truthfulness, but his unfavorable response was responsive to Holbrook's question and the objection was properly overruled.

Holbrook's remaining allegation of error concerning the testimony of Detective Gardner is also meritless. Holbrook contends that Detective Gardner offered improper opinion testimony about his criminal responsibility. While Detective Gardner did offer an opinion on Holbrook's culpability, there was no error as this issue was raised during cross-examination by Holbrook himself. During cross-examination, Holbrook asked Detective Gardner, "[a]nd so it's your belief that it's Mr. Holbrook who actually killed Mr. Bryant?" By asking this question, the prosecutor was permitted to explore during redirect examination the basis of Detective Gardner's belief in Holbrook's culpability. As such, the trial court properly denied Holbrook's objection to this testimony.

[7] Holbrook contends that the admission of this evidence violated his rights under the Fourteenth Amendment to the United States Constitution.

19

2003) (citing KRE 403) ("[P]hotographs that are probative of the nature of the injuries inflicted are not excluded unless they are so inflammatory that their probative value is substantially outweighed by their prejudicial effect."); *see also Fields v. Commonwealth,* 12 S.W.3d 275, 279 (Ky. 2000) (citing *Bedell v. Commonwealth,* 870 S.W.2d 779 (Ky. 1993)).

Holbrook relies on *Hall v. Commonwealth,* 468 S.W.3d 814 (Ky. 2015) to argue that the trial court's admission of these photographs was erroneous. However, this Court's concern in *Hall* that the trial court act as a gatekeeper in examining photographic evidence was clearly on display in the case at bar. As acknowledged by Holbrook, the trial court conducted a careful examination of each of the proffered photographs. Indeed, the trial court prevented the Commonwealth from introducing a significant number of photographs concluding that they were not relevant or were cumulative. In particular, when the Commonwealth sought to admit approximately fifty-five photographs of Bryant's autopsy, the trial court instructed the prosecutor to review the photographs to identify those photos that were relevant and to avoid unnecessary duplication. Ultimately, only sixteen autopsy photographs would be admitted at trial. Additionally, unlike in *Hall,* there was no crime scene video introduced into evidence – the proffered photos were the only way to demonstrate to the jury how Bryant's body was found, weighed down to prevent its discovery, and how it was recovered by the authorities.

Clearly the photographs of Bryant's body had substantial probative value. In particular the photographs established the location of the crime,

Holbrook's attempt to conceal Bryant's body, and the injuries to Bryant that resulted in his death. We acknowledge that the photographs likely caused some prejudice due to the graphic nature of Bryant's death. However, we have explained that as a general rule "a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992) (citing *Gall v. Commonwealth*, 607 S.W.2d 97 (Ky. 1980)). Accordingly, the trial court did not abuse its discretion in determining that the photographs' probative value substantially outweighed their prejudicial effect.

## IV. Holbrook's Incriminating Pretrial Statements Were Properly Admitted

Holbrook also contends that three incriminating statements that he made to Conn, Robinson, and Stacy were improperly admitted.[8] We review this claim under an abuse of discretion standard. *Meskimen*, 435 S.W.3d at 534.

At trial, the jury learned that Holbrook had made statements to each of the men, concerning Camacho's efforts to demand or cajole Holbrook into bringing Bryant to him. Specifically, Conn testified that Holbrook had told him that Camacho had offered him money to bring Bryant to him, but Holbrook said that he would never do that. Similarly, Robinson testified that Holbrook informed him several weeks prior to Bryant's disappearance, that Camacho

---

[8] Holbrook contends that the admission of this evidence violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Sections Two and Eleven of the Kentucky Constitution.

21

had offered him money to bring Bryant to him. Robinson explained that Holbrook told him that he refused the proposition.

Additionally, Stacy testified that after Bryant's disappearance he unsuccessfully approached Holbrook to purchase cocaine. In the ensuing discussion Holbrook explained that "he wasn't messing with those people anymore" and that someone ended up dead. Stacy was uncooperative during subsequent questioning and denied informing Detective Gardner about statements allegedly made by Holbrook to him. As such, Detective Gardner was called to testify and explained that Stacy had informed him earlier that Bryant owed Camacho $2,600 and when he failed to pay, Camacho ordered Holbrook to seize Bryant. Afterwards, Holbrook brought Bryant to where Ratliff and Camacho were, and the pair murdered him.

In reviewing the challenged statements, we differentiate between those statements where Holbrook made a declaration as opposed to Holbrook's reiteration of Camacho's statement to these three witnesses. In the case of the former, Holbrook's statements would be admissible as admissions of a party under KRE 801A(b)(1). The latter statements, the testimony of Conn, Robinson, and Stacy (Detective Gardner) regarding statements alleged to have been made by Camacho to Holbrook, were double hearsay.

While double hearsay, this testimony was nevertheless admissible as "each part of the combined statements conforms with an exception to the hearsay rule." KRE 805. The trial court permitted the introduction of the double hearsay statements, as they concerned an admission of a party,

22

Holbrook, under KRE 801A(b)(1) and the statements within concerned the declarant Camacho's state of mind under KRE 803(3). KRE 803(3) provides in relevant part:

> Then existing mental, emotional, or physical condition.
> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory . . . unless it relates to the execution, revocation, identification, or terms of declarant's will.

Holbrook contends that KRE 803(3) is inapplicable as the statements concerned Camacho's state of mind, his interest in harming Bryant, rather than the state of mind of declarant Holbrook. This argument misapprehends the relevant declarant to whom the KRE 803(3) exception applied. Holbrook's statements to Conn, Robinson, and Stacy concerned discussions he had with Camacho regarding the need to transport Bryant to Camacho. Camacho's statements can be interpreted as establishing a plan or motive between Holbrook and Camacho for the murder of Bryant. These statements exposed declarant Camacho's plan or future intentions towards Bryant, while also implicating Holbrook in Bryant's murder. They were admissible under KRE 803(3) as Camacho's state of mind and plan were relevant to an issue before the jury, *i.e.*, an understanding of why Holbrook would kill his "best friend" Bryant. *See Ernst v. Commonwealth*, 160 S.W.3d 744, 753 (Ky. 2005) (citing *Blair v. Commonwealth*, 144 S.W.3d 801, 805 (Ky. 2004); *Bray v. Commonwealth*, 68 S.W.3d 375, 381-82 (Ky. 2002)). Accordingly, the trial court did not abuse its discretion in permitting the introduction of this evidence.

## V. The Trial Court Properly Instructed the Jury

Holbrook contends that the trial court erred by instructing the jury on complicity and that as such his right to a unanimous verdict was violated. We disagree.

It is well established that the trial court is required to instruct the jury on the "whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999) (citing Kentucky Rule of Criminal Procedure (RCr) 9.54(1); *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky. 1954)). "We review a trial court's rulings regarding instructions for an abuse of discretion." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006) (citing *Johnson v. Commonwealth*, 134 S.W.3d 563, 569-70 (Ky. 2004)).[9]

In the case at bar, there was evidence that Holbrook might not have been solely responsible for Bryant's death and that he might have been working in concert with others. In particular, Detective Gardner testified about a statement made to him by Stacy, which concerned a conversation between Stacy and Holbrook. It was alleged during that conversation, that Holbrook admitted to transporting Bryant to Ratliff and Camacho who then murdered him. Also, there was testimony from Detective Collett about Tony Lewis's claim

---

[9] As Holbrook's complaint concerns the trial court's decision to instruct the jury on complicity, rather than the wording of the proffered instruction, abuse of discretion is the appropriate standard of review. *See Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015) ("[A] trial court's decision on whether to instruct on a specific claim will be reviewed for abuse of discretion; the substantive content of the jury instructions will be reviewed *de novo*.").

24

that Holbrook murdered Bryant to erase a debt owed to Camacho. Based on these facts, there was sufficient evidence for the trial court to instruct the jury as to complicity under Kentucky Revised Statutes (KRS) 502.020.[10] There was no error.

## VI. The Commonwealth Did Not Improperly Define Reasonable Doubt During Voir Dire.

In his final allegation of error, Holbrook contends that his conviction should be reversed due to the prosecutor's allegedly impermissible remarks concerning the reasonable doubt standard during voir dire. The relevant portion of voir dire, including bench conferences, is as follows:

> Prosecutor: You've heard this word, phrase, used sometimes, beyond a reasonable doubt. And we'll talk a little bit about beyond a reasonable doubt. I'm getting close here. But this is an important concept for me to talk about. Is there anybody here that believes Mr. Holbrook is guilty right here right now? Nobody? Ok, that's good. Because our system requires myself, the Commonwealth, to prove that he's guilty beyond a reasonable doubt of the crime that he's charged with. Now as I mentioned before he is charged with murder, tampering with physical evidence. But there's that presumption of innocence. Now, the term beyond a reasonable doubt, let me ask [potential juror #1], what do you think beyond a reasonable doubt means?

> Potential juror #1: It means what would be reasonable with the evidence.

[10] Holbrook contends that the case at bar is "on all fours" with *Wolbrecht v. Commonwealth*, 955 S.W.2d 533 (Ky. 1997). However, a cursory review of *Wolbrecht* demonstrates that is inaccurate. Reversal was warranted in *Wolbrecht* not because of a complicity instruction concerning an unknown principal, but rather due to the amendment of the indictment late in trial to address complicity liability. *Id.* at 536-37. That change midway through the proceedings "placed the defense in the position of beginning its case totally unprepared on the issue raised by the amended indictment." *Id.* at 537. In the case at bar, the Commonwealth's motion to amend the indictment was granted on May 12, 2014, nine months in advance of trial and therefore did not implicate the concerns raised in *Wolbrecht*.

25

Holbrook counsel: Approach, your honor.

Trial court: Yes.
Bench Conference

Trial court: Your objection is because he is attempting to define beyond reasonable doubt? Yeah, I'm not going to allow that question. You're not allowed, well.

Prosecutor: I asked her for her opinion.

Trial court: You're asking her what do you believe beyond a reasonable doubt is and I think to some extent you are hinting at a definition of it.

Prosecutor: I can't tell her right or wrong.

Trial court: You can't tell her but I don't want you touching on it. Rephrase your question, if you want to ask it in a different way. By asking if you believe beyond a reasonable doubt is, I think that is, that is too close to the line. I'm going to sustain the objection.

Open Court

Prosecutor: Let me go back to [potential juror #1], beyond a reasonable doubt, it doesn't say beyond all doubt. Do you agree with that? Does everybody agree with that? So it's beyond a reasonable doubt, not beyond all doubt. So that's the standard you'll get at the end of the case. That you'll get on the instructions. For some of you that's on prior juries, you know what I'm talking about. You get instructions, or definitions, for the charges, and you have to go through them and that's the standard of proof that we have to prove, beyond a reasonable doubt. So, can everybody hold me to the standard of beyond a reasonable doubt and not something higher than that? Anybody feel any differently than that?

Potential juror #2: I can't hardly hear you. You need to speak up just a little bit higher.

Prosecutor: I'm sorry. The question was can you hold me to the standard of beyond a reasonable doubt and not something higher than that?

26

Potential juror #2: That's a good question. I don't know.

Prosecutor: You don't know. Ok, so did you hear the previous question about, I asked [potential juror #1] that it didn't say beyond all doubt. Is that something you think you would need for us to prove?

Holbrook counsel: Approach, your honor.

Trial court: Yes.

Bench Conference

Holbrook counsel: I think that's going behind the [trial] court's ruling though. You laid it out clearly what's not to be done and I think they're trying to keep going there.

Trial court: You asked the question and they've agreed they're not going to hold you to a higher standard than what the standard is.

Prosecutor: [Potential juror #2] didn't.

Trial court: Let me finish. You asked the question and they all agreed with that. [Potential juror #2] then interrupted you and said he couldn't hear you and you needed to speak up then you reiterated to him. I'm going to let you discuss with him what the standard is. I mean, I may need to ask him the question just to be clear, because he's liable to go off on some other issue.

Prosecutor: Do you want to bring him up?

Trial court: Well I don't think that's necessary. There's a standard and they're all going to have to follow the standard and if they think they get to go above that then they're not appropriate for the jury. So let me just ask him that.

Open court

Trial court: [Potential juror #2], this is to you because you had a response. You understand that at the end of the trial there will be some instructions from the [trial] court which will be the law of the case. You'll be required to follow those instructions. In those instructions the standard will be that

27

the Commonwealth must meet their burden of proof which is beyond a reasonable doubt. Do you believe that you will be able to follow the instructions and do what the instructions require of you?

Potential juror #2: Yes.

We note at the onset that "[t]rial courts are granted broad discretion and wide latitude in their control of the voir dire examination under RCr 9.38." *Rogers v. Commonwealth*, 315 S.W.3d 303, 306 (Ky. 2010). However, that discretion is not unfettered. This Court has repeatedly held that the term "reasonable doubt" is not to be defined. *See Smith v. Commonwealth*, 410 S.W.3d 160, 169 (Ky. 2013); *Commonwealth v. Callahan*, 675 S.W.2d 391, 393 (Ky. 1984); *see also* RCr 9.56 (stating that the jury is not to be instructed as to the definition of "reasonable doubt."). However, we have held, subject to appropriate limits, that this rule is not violated by stating what reasonable doubt is not. *See Johnson v. Commonwealth*, 184 S.W.3d 544, 549-550 (Ky. 2005) (prosecutor's remark during voir dire that "beyond shadow of doubt" was not the same as "beyond reasonable doubt" was not impermissible attempt to define reasonable doubt).

In the case at bar, the Commonwealth did not improperly define reasonable doubt. The trial court properly barred the Commonwealth from inquiring of a juror to provide a definition for reasonable doubt. Subsequently, the Commonwealth's questions were to establish that the jury was obligated to hold the prosecutor to the burden of proving the case "beyond a reasonable

28

doubt," rather than a higher standard. This was permissible as it did not offer a definition of what constitutes "reasonable doubt." As we explained in *Rogers*:

> trial judges or trial counsel on both sides of a criminal case occasionally have reasonable concerns that prospective jurors may be confused or misinformed by the various standards of proof to which they have been exposed by prior jury service, news reports, television shows, or elsewhere, resulting in the inability or unwillingness of jurors to apply the reasonable doubt standard. The history of our cases on the subject plainly demonstrates such concern from the prosecutor's perspective, and we have consistently held their efforts to point out that reasonable doubt is not 'all doubt' or a 'shadow of a doubt' were either proper or were, at most, harmless error.

315 S.W.3d at 308. Accordingly, we conclude that the prosecutor's statements in voir dire did not improperly define reasonable doubt.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of the Morgan Circuit Court.

All sitting. All concur.

29

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General
Office of the Attorney General